UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
SOUTHERN DIVISION

| | | |
|---|---|---|
| HILARY ROGERS, | ) | |
| | ) | |
| Plaintiff, | ) | Jury Demanded |
| | ) | |
| v. | ) | Case No. _____ |
| | ) | |
| PARKRIDGE MEDICAL CENTER, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

Plaintiff sues Defendant and shows unto the Court as follows:

### I.  JURISDICTION

1.      The jurisdiction of this Court is invoked by Plaintiff pursuant to 42 U.S.C. §12117 and 28 U.S.C. §1331, to secure protection and redress for the deprivation of rights granted by the Americans with Disabilities Act ("ADA"), providing for legal and other relief against disability discrimination in employment.

### II.  NATURE OF PROCEEDING

2.      This is a proceeding for back pay and benefits due to Plaintiff; for injunctive relief requiring Defendant to cease its discriminatory practices and to rehire Plaintiff to her former position; for compensatory damages; punitive damages; prejudgment interest and attorney fees; and for such additional damages as may be necessary to effectuate the purposes of the ADA.

### III.  THE PARTIES

3.      Plaintiff is a resident of Catoosa County, Georgia.

4.      Defendant is a for-profit Tennessee corporation that conducts business as a hospital located at 2333 McCallie Avenue in Chattanooga, Tennessee, and employs individuals to work at

said hospital in Chattanooga, Tennessee.  In February 2025, Defendant employed more than 500 employees.

5.      Defendant's operations are sufficient to classify it as an "employer" within the meaning of 42 U.S.C. § 12111(5)(a), subjecting Defendant to coverage under Title I of the ADA.

## IV.  RELEVANT FACTUAL ALLEGATIONS

6.      Plaintiff was employed by Defendant at its McCallie Avenue hospital in Chattanooga from September 27, 2022 through February 28, 2025.  Throughout her tenure, Plaintiff worked as a nurse in the Cardiac Cath Lab and reported directly to Aaron Davis, Cardiac Cath Lab Manager.

7.      Plaintiff is an individual with a disability covered by the ADA.  Her disability is irritable bowel syndrome ("IBS"), which is a physical impairment that substantially limits the normal functioning of the digestive system and the normal operation of the bowels.

8.      Without proper treatment, IBS substantially limits the normal operation of Plaintiff's digestive and bowel systems.  Specifically, without treatment, Plaintiff experiences episodes of severe diarrhea, frequent urges for a bowel movement, bloating, extreme abdominal pain, and eight to ten loose stools per day.

9.      However, medication prescribed by her treating physician and a change in diet (including eliminating dairy) have been effective in allowing Plaintiff to control her bowel movements and to significantly limit the negative digestive and bowel symptoms.  Because of proper treatment, Plaintiff's IBS has been well controlled over the past three years.

10.     Despite her IBS disability, Plaintiff could, and did, adequately and safely perform the essential functions of the Cardiac Cath Lab nurse position.  In fact, according to Plaintiff's supervisor, Plaintiff was one of the best nurses in the Cardiac Cath Lab.

2

11. In January 2025, Plaintiff learned that plans were being made to move her office because a disgruntled coworker had complained about Plaintiff's use of the bathroom located closest to her office.

12. On January 21, 2025, Plaintiff was asked to meet with Joscelyn Sroczynski, VP of Cardiovascular Services, and Shonna Moore, HR Senior Leader. In this meeting, Plaintiff explained that she has IBS and that she sometimes has an urgent need to use the bathroom. (Ms. Sroczynski had known about Plaintiff's IBS for at least two years.) Plaintiff reassured them that her IBS was under control with medication and her urgent need to use the bathroom is rare. Plaintiff gave one example of soiling herself in the past, but this occurred while she was in the bathroom (and not in the Cardiac Cath Lab) and was caused by an unrelated GI bleed, prompting an immediate emergency room visit.

13. At the conclusion of this meeting, Plaintiff was told that plans were being made to move her office to the vacant diagnostic sleep center.

14. Over the next two weeks, Plaintiff resisted pressure to move offices, defending her right to use any available bathroom, including the one that was immediately across the hallway from her current office. (The disgruntled coworker who complained about Plaintiff's bathroom use had previously told Plaintiff that she could not use the bathroom nearest her office.)

15. Around this same time, Plaintiff expressed a desire to end her part-time STEMI Coordinator duties which she had voluntarily assumed in April 2024, so that she could redirect her full-time attention to being a Cardiac Cath Lab nurse. (When Plaintiff first assumed the STEMI Coordinator duties on a part-time basis, Ms. Sroczynski promised Plaintiff that she could relinquish these duties at any time in the future.)

3

16. In late January or early February 2025, Ms. Sroczynski informed Cardiac Cath Lab Manager Aaron Davis that Human Resources was investigating whether Plaintiff's bowel issues posed an infection risk. This allegation shocked Mr. Davis.

17. Mr. Davis had long been aware of Plaintiff's bowel issues – a fact commonly known among the staff in the Cardiac Cath Lab. Because of her bowel issues, Mr. Davis would arrange for employee coverage during a patient case to allow Plaintiff to use the restroom. Plaintiff's restroom breaks in these situations were normally less than five minutes. While Plaintiff's restroom use was more frequent than other staff, it was not excessive. Mr. Davis did not believe her restroom use was problematic. In fact, no one ever complained to Mr. Davis about Plaintiff's use of the restroom.

18. Plaintiff never soiled herself or worked in a soiled condition while inside the Cardiac Cath Lab. Nor did she ever fail to use proper hygiene techniques while working in the Cardiac Cath Lab.

19. In response to Ms. Sroczynski's suggestion that Plaintiff was an infection risk, Mr. Davis disagreed. He told Ms. Sroczynski that Plaintiff was **not** an infection risk. Ms. Sroczynski replied that it was "Human Resource's decision and not up to us."

20. No one from Human Resources asked Mr. Davis whether he believed Plaintiff was an infection risk.

21. Defendant never sought an opinion from Plaintiff's treating physician, Dr. Mark Heinsohn, as to whether Plaintiff's IBS was an infection risk. Had Defendant done so, Dr. Heinsohn would have informed Defendant that Plaintiff's IBS was well-controlled with medications, that Plaintiff could properly maintain sterile hygiene techniques, and that Plaintiff

was not an infection risk to patients or anyone else in the Cardiac Cath Lab. (See Letter from Dr. Heinsohn, attached as **Exhibit 1**.)

22. Defendant never asked Plaintiff to submit to a fitness for duty medical examination to determine whether her IBS presented an infection risk.

23. On Friday, February 14, 2025, Plaintiff was summoned to a meeting with Ms. Sroczynski, Ms. Moore, and Michelle Bosworth (Vice President of Human Resources). In this meeting, Plaintiff was informed that she could no longer work as a Cardiac Cath Lab nurse and that she was being assigned to the STEMI Coordinator position on a full-time basis.

24. When Plaintiff asked why she was being removed from the Cardiac Cath Lab nurse position, Ms. Bosworth stated, "We have determined that you are an infection risk." Ms. Bosworth refused to divulge why she believed Plaintiff was an infection risk, despite Plaintiff's questioning.

25. Plaintiff explained that the full-time STEMI Coordinator assignment was effectively a demotion because she would lose significant pay opportunities, including Call Pay and Call Back Pay, available only to the Cardiac Cath Lab nurse position.

26. Ms. Bosworth concluded the meeting by telling Plaintiff that her options were accepting the demotion or termination, and that she had until Monday, February 17, 2025 to provide a response.

27. On Sunday, February 16, 2025, Plaintiff sent an email to Ms. Sroczynski, Ms. Moore, and Ms. Bosworth requesting additional information to assist her in determining whether to accept the full-time STEMI Coordinator assignment. In this email, Plaintiff explained that she does not have incontinence problems and again asked for grounds supporting the claim that she is allegedly an infection risk.

5

28. Ms. Bosworth replied by email that same day that "there is not a need for lengthy written responses back-and-forth" and that her questions could be discussed in person on Monday.

29. Plaintiff responded by email that the infection risk theory was based on a false accusation and that accepting the STEMI Coordinator role would result in a substantial pay decrease. She therefore refused to resign from her Cardiac Cath Lab nursing position.

30. The next morning, Monday, February 17, 2025, Plaintiff provided a written response in which she declined the demotion to STEMI Coordinator and accepted termination.

31. On the afternoon of February 17, 2025, Plaintiff received a letter from Ms. Bosworth in which she claimed Plaintiff was an infection risk because of "fecal incontinence in the workplace, including while working in patient cases in the Cath Lab." Ms. Bosworth further noted that following their meeting on the afternoon of February 14th, Plaintiff "caused a scene" in which she allegedly screamed and cursed at Ms. Sroczynski. The letter concluded that Defendant would not accept Plaintiff's resignation until it completed an investigation into the alleged incident with Ms. Sroczynski.

32. The allegation that Plaintiff yelled and cursed at Ms. Sroczynski is false. Plaintiff suffered a panic attack after the February 14th meeting with Ms. Bosworth. Ms. Sroczynski approached Plaintiff while she was crying uncontrollably. Coworker Sara Crabtree, who was present, confirmed that Plaintiff did not curse Ms. Sroczynski. In fact, Ms. Crabtree later advised Ms. Sroczynski via email on February 20, 2025, that Plaintiff was experiencing "a full-blown panic attack" and "just couldn't control herself."

33. On February 19, 2025, Ms. Sroczynski approached Mr. Davis and asked how many times Plaintiff was "tagged out" in the Cardiac Cath Lab during a patient's case – that is, temporarily replaced so that she could use the restroom. Mr. Davis informed her that he had only

6

a few text messages.  Ms. Sroczynski appeared dissatisfied and stated words to the effect that he needed to find more evidence because "your job depends on it."

34.    On March 5, 2025, Plaintiff received a separation notice indicating that she had been fired effective February 28, 2025 for "lack of effort / unsatisfactory performance."

35.    On March 6, 2025, Plaintiff received a disciplinary action notice signed by Ms. Sroczynski and Ms. Moore stating that her employment had been terminated for yelling and cursing at Ms. Sroczynski and for not being truthful about infection control concerns.  The disciplinary action notice indicated termination for "conduct/behavior," and the box for "performance" was not checked, contrary to the reason given on the separation notice.

36.    When the decisions were made to remove Plaintiff from the Cardiac Cath Lab position and to terminate Plaintiff's employment, Defendant's decisionmakers were aware that the law prohibits employment decisions based upon an employee's disability.  Defendant's decisionmakers further understood that the law requires an individualized assessment based upon the best objective evidence before determining that an employee's disability poses a direct threat.  Despite this knowledge of the law, Defendant's decisionmakers acted, at a minimum, in reckless disregard of Plaintiff's ADA rights, or at worst, with malicious intent.

## V.  PLAINTIFF'S LEGAL CLAIM

Disability Discrimination

37.    Plaintiff is a qualified individual with a disability within the meaning of the ADA.  In the alternative, Defendant regarded Plaintiff as having a disability.

38.    Plaintiff's disability, or in the alternative, Defendant's perception that Plaintiff had a disability, was the "but for" cause of Defendant's decision to remove (demote) Plaintiff from her Cardiac Cath Lab nursing position and later terminate Plaintiff's employment.

7

39. Defendant cannot carry its burden of proving that Plaintiff's disability posed a direct threat to herself, coworkers, or patients. In other words, Defendant cannot show that Plaintiff's disability was "a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation." 42 U.S.C. § 12111(3). In this case, Plaintiff's disability did **not** pose a direct threat to the health or safety of anyone, including patients.

40. Defendant failed to undertake an individualized assessment of Plaintiff's present ability to safely perform the essential functions of the Cardiac Cath Lab nursing position, pursuant to 29 C.F.R. § 1630.2(r).

41. Defendant's "infection risk" determination was not based on reasonable medical judgment, nor was Defendant's determination based on the best available objective evidence.

42. By subjecting Plaintiff to adverse employment actions (removal/demotion and termination) because of her disability, Defendant violated the ADA, specifically 42 U.S.C. §12112(a).

## VI. ADMINISTRATIVE EXHAUSTION

43. On March 20, 2025, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC), which was assigned Charge Number 494-2025-02457. On September 17, 2025, the EEOC issued Plaintiff a Notice of Right to Sue. Plaintiff filed this Complaint within 90 days of the Notice of Right to Sue.

## VII. DAMAGES

44. As a result of the wrongful actions of Defendant as described above, Plaintiff has suffered both financially and emotionally. In particular, Plaintiff has lost and will continue to lose wages and valuable employee benefits. In addition to the actual and financial loss Plaintiff has sustained, she has suffered emotional grief because of Defendant's illegal actions.

8

## VIII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays as follows:

a.      That the Court issue and serve process on Defendant and require Defendant to answer within the time prescribed by law;

b.      That Plaintiff be awarded judgment for damages for lost wages and employee benefits which she has lost from the date of Defendant's discriminatory actions through the date of trial;

c.      That the Court issue an injunction requiring Defendant to reinstate Plaintiff, or in the alternative, to award front pay in lieu thereof;

d.      That Plaintiff be awarded additional compensatory damages, including damages for emotional grief, humiliation, and embarrassment;

e.      That Plaintiff be awarded punitive damages pursuant to 42 U.S.C. §1981a;

f.      That Plaintiff be awarded attorney fees, prejudgment interest, costs of this action, litigation expenses, and such other relief as the Court deems proper pursuant to the terms of the ADA; and

g.      Plaintiff demands a jury to try all claims and issues triable by a jury.

**MIKEL & HAMILL PLLC**

By: _____s/ *Doug S. Hamill*_____
        Doug S. Hamill, BPR No. 22825
        Attorney for Plaintiff
        620 Lindsay Street, Suite 200
        Chattanooga, TN 37403
        (423) 541-5400
        dhamill@mhemploymentlaw.com

9